If you could withhold for just one second. Mr. Ross, we have some business to perform. And at this point I need to cede the chairmanship to presidingship to my dear colleague, Brother Len, because I need to make a motion. Adam, would you stand, please? We will now entertain your motion. Oh, excuse me, I should have. May it please the court. I'd like to move the admission of Adam Jennings LeVere, who is a member and standing of the bar of, is California still in this country? Okay, well in that case, California. And I can certainly vouch for his good standing in the bar and his eminent credentials to represent this bar and himself admirably in our profession. Adam came in on short notice and has done just stellar work for me. You can always remember you're the first one admitted in this courtroom, Adam. Such is my rather lengthy and rambling motion. Will you grant it? I absolutely agree, Adams and LeVere, since we share chambers near Judge Rader, and I'm pleased to agree. Likewise, and your motion is granted, Judge Rader. Welcome. You raise your right hand, do you swear or affirm that you will report yourself as an attorney and consular of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Congratulations, and welcome to the bar of the United States Court of Appeals. Our first case this morning is Esai v. Dr. Reddy's. Mr. Dinger? Thank you, Your Honor. May it please the Court. I'm going to be spending five minutes arguing the summary judgment issues that are presented on appeal, and Dr. Reddy's counsel, Mr. Ross, will take the remainder of the appellant's opening time to discuss the Court's findings after the trial. The district court erred in granting summary judgment because there was ample evidence in the record to support the selection of Lanzaprazole as a lead compound sufficient to establish the obviousness of rubeprazole, and was also sufficient to establish that the nondisclosure of Lanzaprazole constituted inequitable conduct. There were tribal issues on both sides. Didn't Teva's expert even agree that you can't tell the full level of acid secretion from the test performed by, relied upon here in this instance by Teva? The expert said that the test data in the 726 application didn't allow a precise quantification of the amount of acid secretion, but the patent application itself identified Lanzaprazole, and indeed the prior art showed that compounds with the structure that Lanzaprazole shared with rubeprazole and omeprazole were associated with acid secretion, and Teva's experts testified that the data in the 726 application confirmed what a person of skill in the art would have in the 726 application in light of the prior art, including Brandstrom, which importantly disclosed that compounds with this structure were not only anti-ulcer drugs, but were anti-ulcer drugs that operated by suppressing the secretion of gastric acid. And I should add that in a sense, the judge got hung up. Yes, but very small structural variations in this field produce wildly different properties. I'm still struggling to understand why just the listing of this particular one in Lanzaprazole would identify it as a starting point. Well, it would be, there were very few drugs in this class of Brandstrom core-structured compounds disclosed in the prior art that were identified as having powerful anti-ulcer characteristics. Lanzaprazole was, and this is undisputed, shown to be 20 times superior to omeprazole, and the evidence is also undisputed that persons of skill in the art viewed omeprazole as the gold standard. That was the compound against which every, because it was the first successful commercial PPI, that everybody in the field was trying to develop compounds that were better than omeprazole. The prior art disclosed that Lanzaprazole, more perhaps than any other prior art compound, was better than omeprazole. That 20 times better is in the rat test, right? It was the indomethacin test set forth in the 726 application. The rat test. And didn't the district court discount a little bit, though, saying maybe even the dog tests were better? Well, the evidence was clear and could not have been rejected summarily that a person of skill in the art would have recognized the indomethacin test as indicating the superior anti-ulcer characteristics of Lanzaprazole. I suggest that arguments about whether or not maybe a person of skill in the art would be, would have been happier to see the dog test or the fistula test is a disputed issue of fact that should not have been resolved on summary judgment. There was clear expert testimony that a person of skill in the art would view the data in the 726 application as pointing to Lanzaprazole as a lead compound, one of few if any compounds that showed the most promise as a way to develop the next generation of anti-ulcer medication. Right. But the judge said, did he not, that the fact the anti-ulcer activity was not dispositive of the inhibition of acid secretion. And there was not the nexus there. I mean, accepting what you say about anti-ulcer activity, why do we care? Why does that change the result here? Well, I suggest the anti-ulcer activity is sufficient to identify Lanzaprazole as a lead compound. If you look at the 552 patent itself, you know, the title of the application talks about anti-ulcer, not anti-secretory. The field that's identified in the patent is the treatment and prevention of ulcers, not the treatment and prevention of ulcers by inhibiting peptic ulcers, not suppressing acid secretion. The Supreme Court in KSR said any problem in the field, any important problem in the field is sufficient to motivate a person of skill in the art. It is not necessary that the challenger of the patent demonstrate that the prior art pointed the person of skill in the arts precisely to the motivation that the inventors may have had. So it may have been the case that the inventors were focused on suppressing acid secretion, but identifying Lanzaprazole as a superior anti-ulcer medication is sufficient, I suggest, to identify it as a lead compound. Moreover, there was evidence in the record, the testimony of Dr. Fuller in particular, which suggested a person of in that would understand in the context of the prior art as a whole that that test data was confirming not only an anti-ulcer effect, but an anti-secretory effect. Even if Lanzaprazole, even if we agree with you that Lanzaprazole is the lead compound, is the closest compound, but you still have a problem in the substitution of, the particular substitution that's in question here, because substituting alters key properties, in particular the lipophilicity. I think there is confusion in the record, and it's in part because they say it mischaracterizes our argument in that respect. It was not below, and it is not our argument here, that someone would have selected Lanzaprazole as a lead compound, primarily because it has this fluorinated alkoxy substituent at the 4 position. It did, but it was its characteristics as a superior anti-ulcer drug, and an anti-secretory agent, because the prior art taught that drugs, compounds with this structure, are anti-secretory, that would have identified it. The evidence, and I direct your attention to the testimony. What reason would there be for ordinary skill in the art to make the substitution in question? Because as Dr. Cooperman says, sets forth at length in his declaration, and I encourage, he does a better job than I'm going to do in explaining why this is the case. The prior art in particular, the Brandstrom article, taught persons of skill in the art. Basically the way to get the bang for the buck in terms of developing an improved anti-ulcer medication. But I have to come back to the point that your own experts said that the level of acid secretion was not ascertainable from the EP726 data, which shows that there's really no nexus between anti-secretory and anti-ulcer action. Why would one make that selection based on your own expert statement? Because anti-ulcer action is sufficient as a matter of law after KSR to identify Lansoprazole as a lead compound. Moreover, the testimony of other experts that Teva offered disagreed with Mr. Stoner. This is a summary judgment. It was not a disagreement, even if it were a disagreement, that could have been resolved, that should have been resolved on summary judgment. Teva proffered sufficient evidence to warrant the conclusion that Lansoprazole was a lead compound. I'll just take a minute to finish my answer to Judge Lynn's question. The focus would have been on the substituent at the 4 position. The fluorinated substituent would have been identified as a person of skill in the art as being a mixed blessing because the fluorine in that substituent was electron withholding. And the prior art taught that what you wanted there was a substituent that was electron-releasing, like the alkoxy-alkoxy substituents identified in Junggren and in the Grenstrom article. Now, I want to sit down because I'm eating into Mr. Ross's time. Thank you, Mr. Deng and Mr. Ross. May it please the Court, I'm going to address the issue of inequitable conduct. This case is the flip side of the Purdue-Forma v. Endo case. In Purdue, the case was remanded because the district court made the mistake of finding that the materiality was too high. In this case, what we have is the district court made the mistake of finding that the materiality was too low or non-existent. And in that regard, we submit that the district court made clear errors of both fact and law on both the issues of materiality and intent. First of all, and perhaps most importantly, the district court made a clear error in finding that the two co-pending applications did not contain substantially similar claims. Under DACO, the test is substantially similar, not identical, not overlapping. The district court erred in substituting the concept of ultimate obviousness for prima facie obviousness. And in so doing, the district court also failed to follow this court's precedent in In re Dillon concerning how a patent examiner is supposed to review these things. Instead of analyzing the materiality issue from the point of view of a reasonable patent examiner, he went to the end result and he looked at it from the point of view of ultimate obviousness. But it seems to me the problem you may have is that there were a whole series of arguments that you all made, and therefore the district court pretty much addressed all of them. None of them seems in and of itself to necessarily be dispositive. So it's just a range. It's okay, he didn't say it was highly material, but it may have been, you know, even if it was of low materiality, he accumulated that to reach his decision. Well, the problem, Your Honor, is that if the court should find that his findings on the level of materiality are incorrect, and we submit that they clearly are, then his entire intent analysis is tainted. But what does that mean on the level of materiality? So he said there's low level, and we would say, well, there's not a high level, but it's something more than a low level? Yes. If the court were to find, for example, that the co-pending applications were highly material, that the rejections were highly material, that the withheld prior art, the big golden reference, was highly material, and we submit that each of these things were, then you have to look at how the court analyzed intent. And what the court basically said is these folks would not have had a motivation to withhold any of this stuff because none of this rose to the level of being seriously material. They would have gotten a patent anyway. And the prism through which the court analyzed the admissions of the in-house patent attorney was this prism of kind of no harm, no foul. But what do we have in this case? We have the in-house patent attorney, the Japanese patent counsel, admitting that he understood the big golden reference, that he understood why the examiner cited it, that he understood what it added to the mix. But what evidence did you even proffer of intent? We proffered the live— You focused on materiality, and you said, well, if it's material enough, there's intent, right? Not at all, Your Honor. We have live admissions from the in-house counsel who indicated that he made deliberate decisions to withhold each of the pieces of information— But not necessarily a deliberate decision to mislead. Well, Your Honor, this court has recently—in fact, last week—indicated and reaffirmed its longstanding concept that in the absence of a credible reason for withholding the information, intent may be inferred where a patent applicant knew or should have known that the withheld information would be material to the PTO's consideration of the patent application. We submit that the district court did not make any findings that are based on the record that there was any good-faith, credible explanation for why it was that this information was withheld. For example, in the case of the Fujisaki declaration, the in-house patent attorney admitted that he made a deliberate decision to withhold the information. The district court never decided, never analyzed the evidence of whether there was any good-faith explanation for that. Instead, the district court found that the declaration was not misleading because the omitted information was not prior art. Your view is if we were to disagree with the district court that everything he said was not material or of low materiality becomes high, then that requires complete re-evaluation of the intent to deceive Prong because he's misunderstood what was, in fact, not given. I think that's right, Your Honor. I think there's no question that the district court viewed this case from the prism of low materiality, and this brings me back to the Perdue decision. In Perdue, it's really the flip side of the situation. The district court made findings on the issue of intent that were predicated on a finding of high materiality. This court found that the materiality determination was incorrect and therefore remanded. I suggest that we have the same case here. Don't you have to meet some threshold of intent, however? Well, I think we did, Your Honor. I think we've proven both knowledge of materiality and... Withholding, but that's not intent to deceive. Well, but I don't think the district court focused on the question of whether there was any good-faith explanation. I think this court's precedent indicates that if we prove knowledge and knowledge of withholding, it's incumbent upon the patentee to provide some good-faith explanation for how this could have happened. Remember, we have a pattern of withholding. This patent application was pending for... The two co-pending applications were pending for three years. There were multiple opportunities, sometimes within days of each other, when the patentee could have come clean, and at each point, the patentee chose not to disclose. Thank you, Mr. Ross. I think we have your point. We've consumed all of your time, but if we could restore three minutes of rebuttal time, and if you'll add three minutes to Mr. O'Malley's time if he needs to use it, then we'll still end up pretty even. Mr. O'Malley. May it please the court. Let me start with Lansoprazole since my opponent started there. Teva set up the straw man that acid inhibition is the key to finding the lead compound. The reason they did that was in 1986, there was a wealth of prior art out there. There were many patents that claimed superiority over the gold standard omeprazole based on anti-ulcer data. There's the Takeda sister application that's referred to, the 464. There's a big golden 518 patent that's referred to in Reddy's brief. So they had a problem. They had to narrow down the leads. Takeda, the recent post-KSR case, reaffirmed that if you choose a lead compound, you have to justify it, and you have to show that it's not one of a multitude, because if it's one of a multitude, what is the chance that you pick the right path to the claim compound? So they made a conscious decision to say anti-ulcer doesn't count. Acid inhibition is the key. And they set up that straw man, not the court, but it fell apart in expert depositions. The judge didn't decide any material issue of fact. Their own experts, three of them, were forced to admit there's no correlation between the data in the Lansoprazole application and anti-secretory or acid inhibition. But how, in your view, I mean, your opponent mentioned that as a matter of law, post-KSR, a different result is sort of compelled. I don't mean, you know, assuming that's your, I mean, how did KSR, in your view, change the landscape with respect to, we're talking about motivation to select, right? Certainly. Luckily, we don't have to judge that in the abstract, because we have the Takeda decision, which is post-KSR. And it's very much on point. In that case, the defendant says, I have lead compound B. And that's where anyone would start in the relevant time period to start their pathway to the claimed compound. Ultimately, the problem that the court had with that was there was about 90 equally probable lead compounds under the criteria that that defendant identified. And the court said that's too much. And the court distinguished, for example, the Pfizer-Norvas decision, where the defendant was able to get it down to about three relevant salts. There were too many pathways. And KSR, the cornerstone of KSR, is common sense. And if in 1986, this hypothetical person of ordinary skill has all the references in front of him, but he has to be lucky enough to pick one of dozens of different pathways to get to the right claimed compound, then that's not obviousness. It's like picking a needle in the haystack. And so I think Takeda's on point. The other part where— What are the likely lead compounds other than Lansoprazole? Sure. It would include every compound in that application other than Lansoprazole. How many? In giving data, there was a dozen disclosed. There's—I don't have a number for you. Quite a few more within the genus that's disclosed. There's the sister Takeda application, another 12 to 15 with data, a much larger genus of compounds disclosed. There's a Bic Golden 518 application, some 20 compounds with data, a huge genus disclosed. But isn't Lansoprazole the one with the 20 times better rate as everyone concedes? Well, this is where Tava flip-flopped. Once ulcer, once acid inhibition was struck down as a straw man that it was, they said, well, okay, let's talk about anti-ulcer. You got me. Let's talk about anti-ulcer. Even anti-ulcer, it's better. But the court said, no, we're going to reset up this straw man. It fell apart. And therefore, I'm not going to go to your secondary and tertiary arguments. The other place significantly where this prima facie obviousness argument falls apart, which doesn't require a trial, is on modification. Here's what Tava's own expert says about Lansoprazole. The teaching of the Lansoprazole application is that all these wonderful properties flow from this four-position pyridine group, this fluorinated substituent. And if you look at that and compare it to the Takeda sister application, really that's the only thing that distinguishes Lansoprazole. And their own expert said, that's the key. That's where all these wonderful properties flow from. Now, what do they say you do in the modification? Well, you take that group from which all good things come and you lop it off and you throw it in the trash. That doesn't make sense. They say, get rid of the four group. After going to that patent for that very reason, first thing we're going to do in modification is get rid of that which attracted us to the compound. We submit that doesn't make sense. Let me shift to inequitable conduct for a moment. Can we shift to inequitable conduct for a moment? Yes, that's where I'd like to go. Ought we not to be a bit troubled by the district court's analysis of the double patenting issue? For example, as I read it, he seems to have said, or she seems to have said, there's no conclusive evidence or it's not conclusive that there would have been a double patenting rejection. And even if they were, it would have been temporary. Is that really the appropriate test to determine materiality? Well, let me handle those one at a time. In terms of the first question, is the issue of a double patenting relevant? I would submit it is a double patenting rejection. The MPEP sets up the duty and it says you have a duty to disclose co-pending applications if the claims or the subject matter is patently indistinct. And the way you decide that, according to the case law, is one prima facie obvious over the other. And so that is what leads you into the analysis, would there have been a double patenting rejection? And what the judge found is that there was no motivation to go from the so-called Ethel homologue to Rebecca's on the 1986 period. No, but my question is whether or not there would have been a double patenting rejection. Is that equivalent to whether or not it's material? That just gets you in the door. That just sets the threshold that that just opens the discussion. If you can't get the bidding that high, then you haven't established that these claims are patently indistinct, therefore the duty under the MPEP doesn't kick in and we can all go home. So that's the bare minimum that the defendants have to establish to even get the discussion rolling. And he found there wasn't adequate support for that. And my opponents say, well, he should have decided on structural similarity alone. But In re Dillon doesn't say that. In re Dillon says you have to have structural similarity in chemical compound claims plus a prior art pathway. And in that case, there was a prior art pathway to get from the claim compounds from the prior art compounds. Here, the judge said there was only conclusory and unsupported expert testimony. Dr. Reddy's expert said homologues, therefore similar. And he basically sat down. The court credited the testimony of Dr. Hopfinger was at Searle trying to develop a PPI in the relevant time period. And he failed. He knows firsthand how unpredictable they are. So the court found, as a matter of fact, that these compounds were not patentably indistinct. And if you agree with that, then this duty to disclose propending applications, we never get there. And furthermore, if you agree with that, this duty perhaps to disclose rejections, you never get there because you've never opened the door. But let's lay that aside because I thought your first question was the key. No matter where the defendants go, Judge Lynch has really buttressed his opinion. If you disagree, that's low materiality. If you think the materiality is a little higher, he says, well, no intent. And if you disagree that maybe there's some intent, he says, well, when I look at this at balancing, I just don't see anything that happened that's so egregious that I'm going to take away this concededly valid patent that protects this very important drug product. So no matter where the defendants go, there's no remand necessary. Well, let me ask you about that. Let's assume hypothetically that the district court judge found either no materiality or very low materiality. And this court were to say, we think all of the references were highly material. Wouldn't that just necessarily require a do-over on the intent to deceive because there's really a discrepancy between what we think these references meant? And doesn't that affect the intent analysis? I think had the court said, I find low materiality and low intent, then yes. Because then he has to rebalance, doesn't he? But when he says, I find low materiality and zero intent, it doesn't matter if you want to adjust the scale on the materiality side. You go back to him, he says, I still found no intent. So I still find no inequitable conduct. So I would say a remand under your hypothetical would be appropriate only when he finds some degree of each. But he found no intent. He had Mr. Taniguchi. We brought every actor they accused of misdeeds to the court so they could be examined, cross-examined. Judge Lynch asked each of them questions. Mr. Miyazawa, Mr. Taniguchi, Mr. Crawford. And at the end of the day, he found them overall to be very credible. He found Mr. Crawford to be absolutely unimpeachable in his credibility. And so at the end of the day, he simply found zero intent. And what bothered him is that the story doesn't make sense. The premise, the motive doesn't make sense. From the day one that the Rubeprizol patent was filed, Rubeprizol was the commercially important drug. Yes, they filed a second application on some other drugs. They said, why not? We could get a blocking patent. Our competitors won't be able to make those drugs. But from the day they filed that second application, it was always less important. And the judge said quite accurately, if you think you have to hide this ethyl homolog, why do you file that second application at all? He didn't believe this motive. He made a factual finding that this alleged motive to get a blocking patent simply doesn't justify filing a patent application on something you're trying to hide. And if, indeed, you're trying to hide this ethyl homolog, why do you file a patent application with almost the same title, the same specification, the reference to the same prior art? As Judge Lynch observed during the trial, it's a little bit like hiding in plain sight. By making that second application so very similar, what Azai basically did was guarantee a go to the same art unit, the same art unit of discrete 10 to 20 examiners. That's not how you hide a co-pending application. And Judge Lynch accurately, or I think appropriately, cited to the Golden Valley decision for a contrast, where the patent attorney there in his second application, he changes the titles of everything. He changes the part names. And he intentionally guarantees that it won't go to the same art unit. That's how you hide a co-pending application. Now, let me go to the issues of materiality. I touched on the co-pending application aspect of it. Again, he found there was no support that Riveprazole would be patentably indistinct from the ethyl homolog. And he observed more broadly, of course, the ethyl homolog claim eventually drops out of the 013. And he observed more broadly, leaving those two dependent claims out, there really is no argument for substantial similarity or patentable indistinction if you look at the claims as a whole. So he finds the claims not so related. And this is an important distinction from the other three decisions that pop up on this issue, Daco, McKesson, and Akron. In each of those cases, in each of those other three decisions, this court found either substantial identity in the claim subject matter, substantial overlap in the claim subject matter. And in the McKesson decision, this court went through an elaborate factual analysis to show how related the claims were and how the rejections in the later filed application really had a material effect or could have had a material effect had they been disclosed in the earlier patent application. And this is the other aspect that really bothered the judge with respect to the story. So, from the first day that the Refresol application was filed, it was always going to issue first. It was the important patent application, it was the one that got all the attention from ASI. The second patent... In McKesson, the other patent had issued, right? I'm sorry? In McKesson. That's right, the later filed patent issues first. In Akron, the later filed patent issues first. In DACO, there's a mixture of applications, but some portion of the later filed applications issued first. And so in each of those cases, there's a real, a so-called real double patenting rejection that could have been made that would have had real world consequences to the patent in suit. For example, in DACO, they hold that had the patentee disclosed the later filed application, he might have had to take a term of disclaimer in the earlier patent in suit application. And even though it wouldn't have affected the term of the patent, he would have had to assert that there was this common ownership, accept this common ownership limitation. Here, there was never going to be any real world consequences, had there even been a double patenting rejection. But if... Why not just make sure that the examiner and the Rebeprazole application knew about all this? Then you'd avoid all this problem in the first place. That's right. And I wouldn't be here. And that troubled Judge Lynch a little bit. And he said, on the basis of that, I'm going to assign some low materiality to this. Because it's better practice, in his view, that there should be disclosure. As a jurist, he wants to know what his colleague's thinking down the hall if he has a similar interest. I grant you that, Judge Rader. But low materiality. Because again, there's no real world consequences. They didn't avoid anything. And he found that they are patently distinct. And he found, in contrast to McKesson, that there was nothing in any of the rejections that occurred in the later filed application that would have had any effect on the prosecution in the earlier file. And let me just touch very quickly... That's not really the standard, is it? It sounds like a sort of a no harm, no foul standard. It goes both to... It doesn't take materiality off the table. If you assume that the co-pending applications have patently indistinct claims, I don't think it takes materiality off the table. For the issue Judge Rader and Judge Lynch both identified, it bothers a jurist not to know what's going on in the next room if it's similar. And that's legitimate. But it affects the degree of materiality. And more importantly, it affects intent. Why would Azai have done this if there are no real world consequences? Now, with respect to the rejections issue, though, I do submit that there is no per se rule that my defendants say that there is in terms of if there's a rejection of co-pending, it's automatically material in the earlier. McKesson decided after DACO first articulated the possibility of this scenario, went through a very fact-intensive analysis to find that the rejection in McKesson would have had real effects in the earlier filed patent-ensued application. In that case, the examiner in the later filed application found this Brady reference, and the examiner says it discloses this critical three-node communication. And in the earlier filed application that becomes a patent-ensued, the patentee said, I'm different from the prior art because I don't have three-node communication. So in that case, this court found a real conflict in those positions. Here, the defendants can't find one. They can't identify one. They talk about asymmetry versus symmetry. In December of 89, in the second filed 013 application, the court points out these big golden four compounds that rebut this argument that was being made in that later filed application about a structural difference, symmetry versus asymmetry. And the defendants say, well, that contradicted a position ACI took in the earlier application. But the only time asymmetry versus symmetry is mentioned is in the first response in March 1989, so nine months before that. And it's mentioned in connection with what Judge Lynch found was a novelty argument, and then it's never mentioned again. And Judge Lynch finds by August of 89, some four months before this debate occurs in the later filed application, the debate in the earlier filed patent and suit application shifted from structural differences to properties. Examiner Fan and Crawford have this debate at the interview, which Examiner Fan records, and they agree that Final comments here, Mr. O'Malley? I would just finally say, again, going back to your point, that having found zero intent, there can't be a remand, even if you want to rejuggle perhaps the levels on these various issues. Thank you. Thank you, Mr. O'Malley. Mr. Dinger, you have three minutes. Thank you, Your Honor. On the summary judgment, let me direct your attention to two places in the record in particular, and then I'll move on. And one is the 726 application itself, and in particular pages 1, 3, 2, 5, 7, and 5, 8, which set forth the endomesithin test data. You'll see that the really good compounds, there are only three of them. And, you know, Mr. O'Malley was at least exaggerating when he said there was a multitude of compounds to select as lead compounds. And the testimony of our experts identified creating a factual issue, why you would focus on lansoprasol. So let me direct your attention in particular to Dr. Cooperman's declaration at pages 20790 to 835 in the record. And now let me turn my attention to the inequitable conduct issue that was tried. The judge just did not think the nondisclosure of the co-pending application, and more important, the rejections in that co-application, were a very big deal. But this court has recognized, and the patent office has recognized. Mr. Stinger, this judge did a careful analysis in each allegation going through materiality, and in each one finding there is, he quotes, there is no clear and convincing evidence of intent to deceive. In each one of these, no evidence of intent to deceive. How do you get past that? Well, in part because there was direct evidence of intent to deceive in the form of the behavior of Mr. Taniguchi, who testified on two consecutive days that he directed one of his underlings to remove reference to particular compounds from a presentation. In connection with one of them, he admitted that he did so because he was concerned about the impact of the information on the 552 patent application. And in the other, he denied up and down it had anything to do with that, and the judge found that that testimony was not credible. This is the unusual case, Your Honor, where we are not completely relying on inferences and circumstantial evidence to prove intent. There was direct evidence of a desire to conceal from the patent office. In each instance, Mr. Taniguchi is mentioned as one who does not present clear and convincing evidence of any intent to deceive. Your Honor, in the end— By name, he mentions it in each instance. Your Honor, the judge, we suggest, erred in assessing materiality. And for the reasons the judge posed to identify, for that reason alone, intent would have to go back for reevaluation. But we think, with respect to intent, the judge simply missed the forest for the trees to an extent that rises to the level of clear error. For example— I'm going to have to hold you to a final statement here, Mr. Dinger. Can I just make one point about substantial similarity? Please. The key is that everybody agrees that if the two compounds, the ethyl homolog and rebeprazole, were prima facie obvious with respect to each other, that's enough of substantial similarity. And under Dillon, substantial similarity coupled with a prior art reason to expect rebeprazole, in this case, would have properties similar to the ethyl homolog, is sufficient to establish prima facie obviousness. That was sufficient to establish the materiality and the duty to disclose. Thank you. Thank you, Mr. Dinger. Our next case is Rick's Mushroom Service.